2-12-06-94 Admiral Mechanical Services v. Joseph Lee May it please the court, my name is Bill Wormuth, I represent the Appellant slash Cross-Appellee slash Employer Admiral Mechanical Services. I'd like to take this opportunity to reserve the five-minute rebuttal to also address the Cross-Appellee's arguments against the Cross-Appeal. If that's okay with the court? Yes. Thank you. We're here today because of Admiral's appeal of the Circuit Court's affirmation of the Commission's affirmation and adoption of Arbitrator Kinnaman's decision awarding benefits to Admiral's employee, Joseph Lee, under the Traveling Employee Doctrine as well as, well basically it's under the Traveling Employee Doctrine because that's all Arbitrator Kinnaman discussed in her decision. And we're here to ask this court to review de novo how that law was misapplied in this case as well as to address the manifest weight standard of review for some of the other factual issues in this case. To take it from your question that you posed, you do not believe that this claimant qualifies as a traveling employee? Well, my understanding of the Traveling apply the facts on a case-by-case basis. And in this case, there are some questions of fact regarding whether Mr. Lee, he was a traveling employee at the time of his accident on June 17, 2010. Okay. Well, he testifies that he spends most of his time going to different job sites on behalf of his employer. On the date in question he was driving to a job site other than the employee's premises, he wasn't going to the employee's premises to work and go home. He was going to a job site that he had to go and meet with a customer. And he does this all the time. Okay. On the way to the job site, driving the company truck, doing company business, he has an accident. How is he not a traveling employee? Okay. Judge. Joseph Lee, he is employed by Admiral Mechanical Services. Admiral Mechanical Services is a sister company of Admiral Heating and Ventilating. On June 16, the day before the accident, Joseph Lee, he received a call from John Guerin, who they had known each other for 20-plus years. They were friendly with each other. John Guerin worked for Admiral Heating. John Guerin said, hey, Joe, can you come down and estimate a project for me at the Aon Center? Joseph Lee, he said yes. Now, there's a question according to Mr. Lee, whether he knew that it was a bank or not. But according to John Guerin, they could not access the premises until 8 a.m. The other issue with the facts is... So why is he going down there? Well, to address the first question, the other issue is whether Mr. Lee, he was actually on his way to the Aon Center, and that's all borne out by the timing of the events. Mr. Lee, he claims three different records from three different sources of time, Mr. Guerin, the phone records, and the, or actually four, the phone records, the ER records, and the police report are all incorrect as to when he was in an accident. If you believe Mr. Lee, he, then he was going directly to the Aon Center when the accident occurred. If you look at the phone records, he would have arrived at the Aon Center more than two hours before they could even access the premises. Wasn't there an explanation? What did the potential customer, what did Guerin say? Didn't Guerin say they were going to meet for coffee? Well, he said if he got here early, they were going to meet for coffee. But Guerin also said, Guerin didn't call him back until he received a call from Joseph Lee, his wife, saying that Joe was in an accident. I thought the record reflected that Guerin called him earlier. He called him, the first call was from John Guerin to set up the date at 530. There's a, there's a 530 that morning. Correct. And John Guerin was at the Aon Center at that time just to set up the date. So, so if they, you know, why would he call at 530 in the morning? I'm not just calling to set up my date. It didn't matter if Joseph Lee, he got here at noon to do the estimate or not, because Admiral Heating and Admiral Mechanical are sister companies. They're going to give the first bid to the sister company. Why Joseph Lee, he decided to get up at six in the morning, according to Joseph Lee, he had to get down there early doesn't smack true. So you're hanging your hat on the fake. He can't be a traveling employee because he was arriving at the meeting early. Is that your argument? My argument is that he was more likely going to the office and merely commuting from his, his place of residence to the office, which is on the way. More likely, is that a factual finding that you think it's more likely or does the evidence say or establish is really the key that he was going to the office? What evidence do you have that you can point to in this record to establish he went to the office? Judge, there's no explanation for Mr. Heating and Admiral Mechanical's supposed meeting at the Aon Center. The records do not make sense. He said it was going to take an hour and 15 minutes from his house in Oswego to downtown if he was going straight. So that would say he was going to get there at 6 a.m. However, the accident occurred at 5.50. He would have never have made it by six in the morning downtown Chicago. It doesn't make sense, but it doesn't matter because they commissioned here's traveling employee and that's the end of it. Now, I think the problem here is you're trying to get into the minutiae and you're getting away from the discretion of the commission. I think we could buy your point if he had a job at 8 o'clock in downtown Chicago and he was going south on 55 towards Springfield. Okay? Nothing you say I don't think in any way contradicts he was heading to meet Garren in Chicago. Because he left two hours early, the commission must find, therefore, that he couldn't have been going to a job site to meet Garren, even though Garren testifies he was. Your Honor, you're from St. Charles. Are you where 88 and 290, where they merge, this is where Admiral's office is, not three miles from that intersection. Let's assume, if this is what you're saying, let's give your argument its full course here. What if he was stopping by the office first? Does that mean he can't be a traveling employee if he goes on to Chicago? I don't see what you're trying to establish here. I would argue that's a commute, then. Because I don't think he's perpetually a traveling employee. If he were leaving his house at Oswego to go to the office in Hillside, Illinois... First and then go to Chicago, that means he can't be a traveling employee, according to you, no? Well, it would depend on the facts. And in this case... But you know what the facts are here. Well, I know what the facts according to Joseph Leahy are, and I also know what the facts are according to the records. Three, four different sources do not support Joseph Leahy's timing of the events. The Commission obviously believed him, didn't they? I'm not sure what the Commission believed, because they just rubber-stamped Arbitrator Kinnaman's decision, and I would like to know what they believed. But Arbitrator Kinnaman took the traveling employee doctrine, and this is why we're here today, is because not only is the traveling employee doctrine being over-expanded and over-broadly applied, but it's being misapplied. And this is a perfect example. Now we're kind of getting to what your real point is. You think we should change the traveling employee doctrine? Well, at the... Well, yes, but that's just because I'm representing a lawyer. I'm pretty much arguing your brief, though, don't you? That's true, but I... That we have expanded it beyond where it should be. My understanding where the traveling employee doctrine came was to fill a gap created by the statute whereby you have an employee who is not in familiar territory, staying in a motel, traveling salesman, those types of people, they go out for dinner or a movie at night, get into a car accident in unfamiliar territory, and then they come and say, oh, I had a work injury, and the employer says, oh, no, you didn't. You were just going to a movie. That's not... Well, under this scenario, even under the current case law, that person would clearly not be covered under the employee traveling doctor, and if they're out on some frolic on their own at night... If they're truly a traveling employee, and I'm not arguing that the traveling employee doctrine should not exist, I think it does fill a gap. If someone is put in a situation where they're in unfamiliar territory, and they go out and make a wrong turn down a wrong street and get into a car accident, it's not fair to them to say, oh, you're not... Benefits shouldn't go to you. Quite the contrary, and that's why the doctrine was created. Because of some unfamiliar... So if somebody's driving as part of their job all over northern Illinois every day, unless they make a wrong turn down a wrong street, unfamiliar, they can't be considered to be traveling employees? Judge, this is actually why I'm here, is because why do we have to knee-jerk reaction, put pull it, and call them a traveling employee? Why don't we go through the initial analysis... There's no knee-jerk reaction here. We've decided case after case that people in exactly this guy's situation are traveling employees. But Judge, why can't they go through the course of employment and arising out of analysis first before we get to the traveling employee? That's an exception to the initial analysis... The Illinois Supreme Court, going back to the 1920s, has said they're traveling employees. But the Illinois Supreme Court has also said the burden still remains on the traveling employee to prove that they were in the course and furthest from their employment when the accident occurred. By showing whether or not their actions are reasonable or foreseeable. Exactly. And that analysis was never done in this case. And that's the problem. If you look at Arbitrator Kinnaman's decision, she never makes that reasonable and foreseeable assessment. She just says, Joseph Lee, as a traveling employee, was in the course and furthest of his employment. That's the end of it. Because he was on his way to meet with somebody about a job for the company he works for. Which we would dispute. And I agree with you, Your Honor. Was there any evidence offered that he was going anyplace else? I mean, you're just speculating that he might have been going to stop by the office. Nobody testified that there was any plan for him to stop by the office. John Guerin testified that if he got there, they might meet for coffee. And so, if that were the case, then... Okay, my question is, was there any evidence from anybody that there was any plan for the claimant to stop by the office before he went to see Guerin? Other than the timing, no. Right. In other words, there isn't any. Everybody said he was on his way to meet to do this estimate. Well, no. I mean, it's just a question of timing. Joseph Lee is the only one that says he was on his way to the Ad Center. No one else says that. John Guerin says, hey, we couldn't get in until 8. It was a bank. We can't do anything until 8 in the morning. If we got here early, we'd go to Soprafina's like usual and just have some coffee. And just chew the fat. They were friends. And I don't see us in the course and furthest of the claimants to now have two employees just sitting, having coffee, talking about the horse farm that Joe Lee, he owns. And now you're really off on speculation about they're going to talk about a horse farm. Well, that was in the record. But two hours, two hours is not, two hours to sit and have coffee before the bank opens is not reasonable foreseeable. But we never had that opportunity because our... It's not reasonable foreseeable. I'm from downstate. It's not reasonable and foreseeable that somebody would want to avoid this horrendous Chicago traffic to get somewhere early to avoid traffic. Joseph Lee, he testified that he had been to the AON Center half a dozen times in the two years preceding his date of accident and that it would take him an hour and 15 to get down. Yeah, an hour of horrific stress with cars, Chicago drivers, no signals crossing three lanes. I mean, all of that sort of stuff. It may only take an hour and 15 minutes. But is it not foreseeable that you'd maybe want to avoid that horrific stress? Maybe you can get down there in 45 minutes but actually have normal drivers on the road? I mean, I don't see where time does this for you unless you have... Well, there's four different records that if you followed the timeline based on those records, you arrive at either two conclusions. Either Joseph Lee, he was heading to work before he got downtown or... He was. Are you saying that as a matter of law, if he stopped by the office to pick up something that would have been helpful to the meeting, he can't be a traveling employee? Is that what you're trying to tell us? Let's cut to the chase here. What is this you're intimating? He might have stopped off at the office. So let's assume for the sake of your argument, the evidence established that. Would that mean it took him out of the traveling employment? Again, it would be on a fact-by-fact basis. No, I'm giving you your facts. I'm conceding your facts. Let's assume that what you say is true. You have evidence he stopped at the office, which you conceded you don't. Would that mean he couldn't be a traveling employee furthering the employer's business because he stopped off to get something that would be relevant to the meeting? Is that what you're telling us? Just like the complete funding case, if the employee said, I was going to do this, and then, I guess, just like the court said, it would be in the course and furthest of employment. That was also with a myriad of other issues. He had a company-owned vehicle. No, but you're not answering my question. You're ducking the question. Assuming that that's the argument you have, you're giving us now, you're intimating he was going somewhere else. It looks like the situs of the accident, the time of the accident, you keep saying he might have been stopping off at the office. Does that mean he could not be a traveling employee if he stopped at his office first before he went to the meeting to further the company's business? I mean, we'll look at the case law, if you have such case law. Do you have case law that says that? It doesn't preclude him from being a traveling employee, but if he's just going to the office, does that mean he's perpetually a traveling employee? Many people go to and from the office, and they're not. No, he wouldn't. In that case, you know what? He probably, I would concede, not been, as a matter of law, a traveling employee if he was going to the office that day just for the company business. But he wasn't. You have a third party testifying. He had a meeting set up with him. So at some point, according to the undisputed evidence, he was meeting with Garen in downtown Chicago. Correct? Correct, but not at 6 in the morning. The only person saying 6 in the morning is Joseph Lee. Again, as Justice Holder said, you're hung up on this time. The time then apparently precludes him from being a traveling employee. You can't have it both ways. I guess I don't understand, because the old, how is it reasonable and foreseeable for him to leave and be downtown two hours before they can even do any work? He must have quite the rush hour commute, as our learned colleague just said. He never testified to that. And he drives to Hillside for 15 years from Oswego. He's well aware of the traffic, and it just doesn't add up. But the real issue is the misapplication of the traveling employee doctrine, and there's no assessment or analysis regarding the reasonable and foreseeableness of Joseph Lee, his actions, or his accident, or when the accident occurred. Now, did the accident occur between his home and arguably the office? The accident occurred 10 miles from his home. So there's no way to say whether he was going to the off, well, this is our argument, whether he was going to the office or whether he was going directly to the Aon Center two hours before his. But it occurred between, it occurred on the route between his home and the Aon Center, right? Yes, but it also occurred between his home and his office. Okay, but between his home and the Aon Center. I mean, what if it was just a complete detour on, I mean, let's say his plan was to get down to the Aon Center because right next door is a toy store that he's going to buy a toy for his son before he started work. Even though that might have been his design, he was traveling from home on the route that would have taken him to the Aon Center at the time that the accident happened, regardless of what his ultimate goal was just prior to working at the Aon Center. True? True, but again, it's, I mean, you go by case-by-case basis. That wasn't his testimony. His testimony does not jive with the testimony of John Guerin. Okay, Counsel, your time is up. Thank you. Your time is up. Counsel? May it please the Court, good afternoon, Mr. Wormuth. My name is Pat Nicholson and I have the pleasure of representing Joseph Leahy in this case. Since we're talking about time, yes, there is some discrepancy about the time as related Why don't you hone in on that? Because I think it's pretty clear that ostensibly this person was a traveling employee. Counsel's argument seems to be, even if that's true, in this case, because of the early time, it's not foreseeable, he's hung up on the fact that he would be getting there very early, an hour or so early for this meeting. So tell us why that does or does not take him out of the traveling employee document. Well, I think if you look at the different times in the record, that Mr. Leahy's testimony was a little bit off as far as when he was actually leaving. And the reason I say that is, Mr. Gerrits said he got to the site, the work site, between 5 and 5.30. He then called Mr. Leahy at 5.38, according to the telephone record, and Mr. Leahy said, I'm on my way. The accident happened, I believe, about 10 miles from his house. So if he was 10 miles from his house at 5.38, and it takes an hour, an hour and 15 minutes to get there, he wasn't going to get there at 6 in the morning, maybe it's more like quarter to 7 or something like that. Mr. Leahy said, I normally work 7 to 3.30, okay? Mr. Gerrits starts at 6 o'clock in the morning at this particular job site. So when this phone call was made, he said, why are you coming early? There was no discussion about that. As far as it being the business of the bank, Mr. Kruger testified that Mr. Leahy had several of his own clients, including some of which were banks. And Mr. Leahy said, normally when I go to a bank, I try to get there before the bank opens, which would mean before 8 o'clock. So I think he was going to get there sometime between quarter to 7 and 7, when he normally does. There was no testimony that Gerrin told him that you couldn't get into the bank by 8. He said that after the fact, that we couldn't get into the bank by 8. They had set up this meeting the night before. Gerrin called him in the morning at 5.38, you know, to see where he was, and he said he was on his way. There's no dispute that obviously Leahy was going to the meeting in furtherance of the company's business. No, there's no other evidence. Counsel makes an inference that perhaps he was going to the office, perhaps he was going somewhere else. If he had stopped by the office for something in preparation for the meeting, would that have taken him under the doctrine of traveling employee? I don't think so, because I think Cox says if you're a traveling employee, you're a traveling employee from the minute you leave your house. And he had left his house. And if he, you know, complete vending, I don't know, maybe there's some argument to be made from that case, because in that case the guy had gone to the office first. But in my opinion, no. Because, you know, once he's traveling, he's traveling no matter where he goes during the day, and then it's the reasonableness and the foreseeability. And in this case, I don't know If he went to a drive-up window, would that have taken him out of the doctrine of a traveling employee? No, I think that's reasonable and foreseeable. If he went to the bar, that's a different question, okay? And, you know, what would be more reasonable and foreseeable than he's driving to go to the meeting? I mean, I can't think of anything more reasonable and foreseeable than that. There's no evidence that he was going to the office anyway, was there? Was there any evidence to establish the speculation? No. Is the only evidence that he was driving from his home to the A.M. Center? It was just a direct route, regardless of what was going to happen once he got there. Is there any evidence that this route that he was on would have taken him someplace else? No. The only thing is, the office was also on the way, although he would have had to go a couple miles off and get back on. It just happened to be that was the same route for that particular job. If he was going to a different job, it took him the same way he would go either way. So you're saying he would have gone past this even if there was never any intention of going to the office, he would have been on the same route, correct? Yes. You're not suggesting that once you're a traveling employee, you're always a traveling employee, are you? No. And, in fact, of the cases that counsel cited in his reply brief, talking about the floodgates opening, there's eight or nine cases by my employee. What they did was not foreseeable. What they did was foreseeable but not reasonable. You know, they were intoxicated, they were on a personal errand, things of that nature. So it depends on the facts of the case. And the facts of this case would dictate that he is a traveling employee and this arose out of in the course of his employment. And for that reason, it's not against the manifest way to the evidence and it should be affirmed. I'll address the bond issue briefly. And the reason that that was raised at arbitration hearing, some of the documents that were submitted had a specimen of Mr. Krueger's signature on there. When the bond was initially filed on the 19th day, it was blank in terms of the principle. When it was filed on the 20th day, with nine minutes before the clerk's office closed, it had a signature on there which did not appear to be Mr. Krueger's. So we raised the question, who put Mr. Krueger's signature on there by affidavit provided after the fact, the worker of the company indicated that he was authorized to do so. Mr. Raffin signed the bond? Yes. It's not disputed that Raffin is in fact one of the respondents' officers, right? There's no dispute. Well, I don't know if he's an officer or he's an employee. But the question was, it seems to me there's two lines of cases. There's the cases where the attorney signed the bond with no indication at the time the bond was filed that he was authorized to do so. Those cases are out the door. There's the first Chicago case where the principal himself actually signed it, but he didn't put down his title. Here, the principal didn't sign it. It's a corporation. Was the principal authorized to have this other guy sign his name? I don't know. Was he authorized to have someone else bind a corporation? I don't know. You will tell us the answers to that question. Well, Raffin signed it, but he didn't sign it in his own name. He signed it in the name of the president, whose name I can't think of right now, right? Mr. Krueger. So you couldn't tell from the face of the bond? Well, you would never tell from the face of the bond if someone just signs whoever the person's name is. Right. Okay? So if we buy this argument of yours, you'd like us to avoid ruling in the merits, right? Yes. To be candid about it? In a word, yes? It's something that we had to raise. And, you know, he could have very simply, like for such and such, okay, or Mr. Raffin on behalf of Mr. Krueger. None of that was, it's a very simple thing to do. They didn't give us much explanation as to why Mr. Krueger just didn't actually sign it himself. So, anyway. Thank you. Okay. Thank you. Thank you, counsel. Counsel, you may reply and respond. Justices, a couple things regarding the traveling employee. John Guerin testified again that he told Joseph Leahy that he probably said come down at 8. That's when the bank opens. That's what Guerin testified to. He never called Joseph Leahy after that. The first time he heard about any accident was when Joseph Leahy's wife called them at approximately 7.30. If they had a meeting at 6, it would seem to me that John Guerin would have asked where Joseph Leahy was. There was no meeting at 6. Where Joseph Leahy was going, I don't know, but it would only make sense to us that he was going probably to his office before he was going to the meeting downtown, Aon Center. And to address the bond issue, pursuant to First Chicago, when Mr. Leahy's counsel questioned the surety bonds, we produced affidavits regarding why the signature was done that way. The counsel for the employee never challenged those affidavits, and now he's bringing these briefs saying that there's some kind of underhanded dealings. First Chicago, the person signed in his own name, though, right? Correct. And I'm not saying it was the ideal way, but Dan Kruger testified by affidavit that he gave Chris Rapp an authority to sign his name, and it's what he did. And the case law, the whole reason for the surety bond is to protect the employee. And in this case, we're not talking about a multinational corporation. We're talking about a small outfit in Hillside, Illinois, where everyone knows everyone so well that they know each other's signature, apparently. And when Mr. Leahy saw that the second surety bond wasn't signed by Dan Kruger, he questioned it. And pursuant to First Chicago, we produced affidavits that described why the signature was the way it was. So in other words, First Chicago allows him to basically remedy the deficiency, correct? Correct. That's what it stands for. Exactly. And the reason for that is because they wouldn't want the situation where the appellee waits until after the 20-day period, and then by gamesmanship attacks the sufficiency of the surety bond, and then the appellant has no way to rectify the situation. And that's exactly what happened here. And now I guess they're crying sour grapes. But they had the opportunity to challenge the affidavits if they didn't believe them, and they did not do that. So at this point, the employer responsibly requests that this court look at the arbitration of the commission's decision and reverse it based on the failure to properly assess the traveling employee doctrine in this matter. Thank you for your time. Thank you both, counsel. The court will stand in brief recess.